**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

GUY YOUTE,                                    )
    *Plaintiff*,                          )
                                          )
v.                                            )
                                          )    3:21-CV-267 (OAW)
GREATER  BRIDGEPORT  TRANSIT                  )
AUTHORITY, et al,                             )
    *Defendants*.                         )
                                          )


## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS ACTION** is before the court upon Defendants' Motion for Summary Judgment

and memorandum in support thereof (together, "Motion").   *See* ECF Nos. 36 and 36-1.

The court has reviewed the Motion; Defendants' Statement of Facts, *see* ECF Nos. 36-2;

Plaintiff's opposition brief, *see* ECF No. 45; Plaintiff's Amended Statement of Facts

("Plaintiff's SOF"), *see* ECF No. 70; Plaintiff's response to Defendants' SOF, *see* ECF No.

69; Defendants' reply brief, *see* ECF No. 80; Defendants' response to the Plaintiff's SOF

("Defendants' Responsive SOF"), *see* ECF No. 79, and Defendants' reply to Plaintiff's

response to Defendants' SOF ("Defendants' Reply SOF"),[1] *see* ECF No. 78; Defendants'

supplemental authority, *see* ECF No. 86; and the record in this matter.   After careful

review, the court concludes that the Motion must be **GRANTED.**

---

[1] The presentation of facts in this case is convoluted.  First, it should be noted that Plaintiff filed several documents, *see* ECF Nos. 48–54, that the court (Hon. Sarah A. L. Merriam, J.), then presiding over this action, did not accept, *see* ECF No. 55.  Plaintiff amended and resubmitted these documents, *see* ECF Nos. 64–70, which Judge Merriam did accept, *see* ECF No. 72, and which are the documents reviewed by the undersigned in this ruling.  Further, Plaintiff filed not only a response to Defendants' SOF, but also a separate Plaintiff's SOF that contained additional alleged facts.  Defendants then not only responded to these additional facts in their Defendants' Responsive SOF, but also replied to those responses Plaintiff had given to Defendants' SOF.  Thus, there are five versions of the statement of facts.

## I.   <u>BACKGROUND</u>[2]

Plaintiff began working as a bus operator for Greater Bridgeport Transit Authority ("GBTA") in or around June of 2009.  ECF No. 78 ¶ 1 and response.  The terms of his employment were governed in significant part by a collective bargaining agreement ("CBA"), which in turn incorporates GBTA work rules.  *Id.* ¶¶ 2–3 and responses.

Less than a year after starting at GBTA, Plaintiff began accumulating disciplinary actions.  In February 2010, he received a verbal warning, a written warning, and a one-day suspension for multiple policy violations, including a violation of GBTA's cell phone policy; in April 2013, he received a written warning for violating motor vehicle laws; in August 2013, he received a verbal warning for failing to listen to a supervisor; in November 2013, he received two written warnings and a one-day suspension for various violations of GBTA policies and procedures; in June 2014, he received a written warning for refusing to board passengers; in July 2014, he received a written warning for making an untrue statement;[3] in September 2014, he received a verbal warning and a one-day suspension, respectively, for allowing a passenger to stand too far forward in the bus and for having extended conversation with a passenger (the latter of which was reported in a passenger complaint); and in April 2016, following an internal investigation, Plaintiff was terminated for overall poor work performance and for touching a female passenger without reason or consent (which conduct also was reported in a passenger complaint).  *Id.* ¶¶ 4–12 and responses.[4]

---

[2] The factual assertions herein are taken from Defendants' Responsive SOF and Defendants' Reply SOF because those two documents contain all alleged facts and all responses and replies thereto.
[3] Plaintiff initially was given a three-day suspension for this conduct, but the discipline was downgraded through the grievance process prescribed in the CBA.  ECF No. 78 ¶ 9 and response.
[4] Just after his first termination, another passenger complaint was lodged against Plaintiff, alleging that he had solicited a female passenger's phone number, asking what she could do for him.  ECF No. 36-5,  at

Pursuant to the grievance process laid out in the CBA, Plaintiff was reinstated in May 2016 under a "last chance agreement," which essentially placed Plaintiff in probationary status for nine months, and which provided that the resolution of Plaintiff's grievance would not be considered in future disciplinary proceedings. *Id.* ¶¶ 12–13 and responses. The parties dispute whether this provisions means that none of Plaintiff's prior bad conduct would be considered in future disciplinary proceedings. *Id.* ¶¶ 12–14 and responses.

In May 2017, Plaintiff received a written warning for an unauthorized layover (which conduct was reported in a passenger complaint); such discipline was upheld through the grievance process. *Id.* ¶ 15 and response. In June 2017, he received a six-day suspension for driving without a valid medical card. *Id.* ¶ 16 and response. In June 2018, he received a one-day suspension for passing by passengers without stopping for them, which discipline also was upheld through the grievance process. *Id.* ¶ 17 and response.

In October 2018, a female passenger complained to GBTA that Plaintiff had made inappropriate comments to her that made her feel so uncomfortable, she had to deboard the bus with another passenger. *Id.* ¶ 18 and response. Defendant O'Keefe (Assistant Manager of Transportation Operations) conducted an investigation that corroborated the complaint, and Plaintiff was placed on unpaid suspension pending additional training. *Id.* Plaintiff denies that he engaged in this conduct, and he also alleges that the video relied upon in the investigation shows no improper conduct. *Id.* He further asserts that although he attempted to grieve the discipline pursuant to the CBA, the union was late in filing its request for arbitration. *Id.*

---

CM/ECF p. 162. Because Plaintiff already was terminated at that point, though, nothing came of this complaint.

Plaintiff also grieved that he was not paid for the time spent in the prescribed training, and in January 2019, Defendant Holcomb (the General Manager) told Plaintiff in a letter that while Plaintiff would be paid for the time he spent undergoing training, any further disciplinary issues would result in Plaintiff's termination.  *Id.* ¶ 19 and response.[5]

In February 2019, another female passenger filed a complaint against Plaintiff, asserting that when they had reached the turnaround point for the bus route that Plaintiff was driving (and on which she was a passenger), she had asked him for money; she averred that he agreed to give her the money, but that when they left the bus to use the ATM at a gas station, he solicited sex from her in exchange therefor.  *Id.* ¶ 20 and response.  Plaintiff denies ever soliciting sex from the passenger.  *Id.*  He asserts that he left the bus to use the restroom at the gas station, that the complainant followed and asked him for money, and that she became upset with him when he refused her request.  ECF No. 79 ¶¶ 6–7.

Plaintiff was suspended pending an investigation, which Defendant O'Keefe conducted and which included reviewing video footage from the bus and speaking with the complainant.  ECF No. 78 ¶¶ 22–24 and responses.  The complainant reiterated her account of the incident, and although the video had no audio, it corroborated the complainant's account to the extent it could without capturing exactly what was said.  *Id.*

In the course of reviewing the video of the incident, Defendant O'Keefe noticed that Plaintiff also committed several other violations on his route that particular day, though Plaintiff denies these other violations, too, either because the alleged conduct was

---

[5] Plaintiff does not admit that Defendant Holcomb so warned him, but as the letter is provided on the record, and clearly does contain the referenced admonition, the court finds that this fact is not in dispute. ECF No. 36-5 at CM/ECF p. 184.

not shown in the video or because the conduct was not improper.  *Id.* ¶¶ 25–31 and responses.  Defendant O'Keefe prepared a memorandum of his investigation, which charged Plaintiff with neglecting to collect a fare; immoral conduct; running ahead of schedule; taking an unauthorized layover; failing to stop at a stop sign; and using a cell phone in violation of the GBTA's electronics policy.  *Id.* ¶ 33 and response.  Defendants assert that this memorandum was given to Plaintiff "at some point," but Plaintiff denies that he received the memorandum prior to his discharge.  *Id.*  Failure to collect a fare is a "Category I" violation, and immoral conduct is a "Category II" violation, per GBTA policy, either of which can result in immediate termination.  *Id.*  ¶¶ 34–35 and responses.

Defendant O'Keefe created an edited video depicting some, but not all, of the violations Plaintiff was alleged to have committed: the incident with the passenger, the failure to collect a fare, and the unauthorized layover.  *Id.* ¶¶ 36–37 and responses.  Plaintiff denies that the video shows any violations.  *Id.*  Defendant O'Keefe used the "automatic vehicle locator" ("AVL"), which tracks where the GBTA buses are and when, to corroborate that Plaintiff was running ahead of schedule.  *Id.* ¶ 38 and response.[6]

Defendant O'Keefe sent the union president the video he had edited, but the president was unable to view it due to technological problems.  *Id.* ¶ 39 and response.  So Defendant O'Keefe allowed the president to view the video on the GBTA system prior to Plaintiff's termination hearing.  *Id.* ¶¶ 39, 42 and responses.[7]

---

[6] Plaintiff objects to this fact because Defendant O'Keefe's memorandum states that he observed the schedule violation on the video, not using the AVL, but this objection is inapposite.  Defendants' Reply SOF states that Defendant O'Keefe first learned of the schedule violations from the bus video, but did not preserve that portion of the video because the AVL captured the corroborating information.  Accordingly, the court deems this fact admitted.

[7] Plaintiff objects to this fact because he asserts that the union president did not get a working copy of the video (which is consistent with Defendants' asserted facts) and because the video the president ultimately saw only depicted the interaction with the passenger.  It is not clear what the president saw on the video. A review of the complete transcript of the union president's testimony at a state labor board hearing

The termination hearing was held in March 2019, with Defendant O'Keefe, HR Director Engram, Plaintiff, and the union president in attendance. *Id.* ¶ 40 and response. Prior to that hearing, the union president had been informed that Plaintiff was being charged with immoral conduct, violating the electronics policy, and failing to collect a fare. *Id.* ¶ 44 and response.[8] At the hearing, the president was informed that there also would be a charge for an unauthorized layover and running ahead of schedule. *Id.*[9] It is not clear whether the video was shown at the hearing; testimony from the union president indicates that it was, ECF No. 67 at 52, but Plaintiff asserts it was not, ECF No. 78 ¶ 46 and response. Plaintiff was given an opportunity to respond to all the charges.[10] *Id.* ¶ 46 and response. It is not clear what he said,[11] but it was insufficient to sway Defendant Holcomb, who terminated Plaintiff for overall poor performance. *Id.* ¶¶ 12, 49 and responses. The termination was upheld through the union's grievance process. *Id.* ¶ 52 and response.

---

shows that the union was given a video of the alleged violations (twice), but the video would not play on their systems. ECF No. 67 at 29. So the president was permitted to view the video on GBTA systems prior to the termination hearing. *Id.* In response to a question asking whether he had seen video of any traffic violations, the president answered that he did not see the traffic violations at that time because the charges were still being compiled and he was mostly interested in the passenger interaction, so that was the portion of the video he viewed. *Id.* at 30–31. Later, though, he stated that he also was shown video of the violation of the cell phone policy and a roll through a stop sign. *Id.* at 43, 48. So while it does appear that there was at least a version of the video depicting most of the alleged charges, it is not clear how much of that video was preserved for the termination hearing.

[8] The union president testified, though, that Defendant O'Keefe mentioned the other infractions at the time he went to see the video, and that he knew these would be charges based on his experience and knowledge of the facts. ECF No. 67 at 50–51.

[9] Plaintiff's objection that the charges were not presented prior to the hearing is no objection to the asserted fact itself, but rather an argument that he ought to have received the charges sooner. The court therefore finds this fact admitted, and will address the argument infra.

[10] Plaintiff objects that he was not given the opportunity to respond because he was not shown the video. However, the court finds that this also is argument. Plaintiff does not dispute that he was given an opportunity to speak on his own behalf at the termination hearing, or that he did in fact do so.

[11] Defendants assert that Plaintiff denied the sexual advances, but did not deny the other violations, but their supporting evidence does not clearly indicate that the cited conversation with Plaintiff occurred at the termination hearing, so the court has not credited this assertion.

Plaintiff claims that prior to his termination, he had complained of discrimination to Director Engram, but he has not recalled the details of these complaints with consistency. In a March 2022 deposition, Plaintiff asserted that he made his complaint at some point when he had been sent to a class, but he could not remember the date.  ECF No. 36-10 at 31–33.  Whatever the date, he asserted that he told her that he was disciplined more harshly than others because he was black and Haitian.  *Id.* at 33.  He could not remember what she said in response to his complaint.  *Id.*  He testified in that deposition that he only complained about discrimination that one time.  *Id.* at 34.  However, in discovery responses dated November 2021, he asserts that he complained to Director Engram in October 2018, and that he also made another complaint in 2019 (though it is not specified to whom he complained), both times alleging that he was disciplined more harshly than others because of his race.  ECF 36-9 at 5 ¶ 2.  No other details are given in that response.  Then, in an affidavit dated August 1, 2022 (several months after the discovery deadline had passed, and on the date that Plaintiff's opposition to the Motion was due), he asserted that in November 2018, he contacted Director Engram to report discrimination.  ECF No. 46 ¶ 30.  There is no additional detail given in the affidavit.  It is undisputed that Plaintiff filed complaints with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") in March 2019 and September 2019, after he already had been terminated.  ECF No. 78 ¶¶ 70–71 and responses.

Although Director Engram has submitted a declaration stating that Plaintiff never complained to her about discrimination, ECF No. 36-11 ¶ 5, the court must view the facts in Plaintiff's favor, and thus must accept as true for the purpose of this discussion that Plaintiff complained of discrimination to Director Engram in October or November of 2018.

Still, it is unclear whether the 2019 complaint mentioned in Plaintiff's discovery response was made to Director Engram, and it actually may refer to the CCHRO complaints. Accordingly, the court cannot find that any complaint was made to GBTA in 2019.

Plaintiff initially filed this suit in state court, seeking damages for asserted violations of Title VII, 42 U.S.C. § 1983, and Connecticut law. Defendants timely removed the action to federal court, and now argue in the Motion that they are entitled to summary judgment on all claims.

## II.   <u>LEGAL STANDARD</u>

A motion for summary judgment will be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). The movant bears the burden of demonstrating that there is no genuine issue of material fact. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1535 (2d Cir.1997)). If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.*

To defeat a summary judgment motion, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*,

143 F.3d 105, 114 (2d Cir.1998).  Rather, the nonmoving party must point to "specific facts in dispute to show that there is a *genuine issue for trial.*"  *Matsushita,* 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).  If the nonmoving party submits evidence that is "merely colorable," or that is not "significantly probative," then summary judgment still may be granted.  *Horror Inc. v. Miller*, 15 F.4th 232, 240–41 (2d Cir. 2021).

When reviewing a summary judgment motion, the court construes the cited evidence in the light most favorable to the nonmoving party and "resolves all ambiguities and draws all reasonable inferences against the moving party."  *Horror*, 15 F.4th at 240.

## III.  DISCUSSION

In Count One, Plaintiff asserts two claims: discrimination (on the basis of race and national origin), and retaliation, both in violation of Title VII of the Civil Rights Act of 1964.  In Count Two, he asserts deprivations of his constitutional rights under both the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[12]  The court takes each Count in turn.

### A.  Count One: Title VII

Title VII provides that it is unlawful for an employer to discriminate against an employee because of that employee's race, color, or sex.  42 U.S.C.A. § 2000e-2.  The statute is intended "to assure equality of employment opportunities and to eliminate those

---

[12] Plaintiff also seemed to assert violations of the Connecticut state constitution, but it is unclear whether those claims ever were properly stated, as Plaintiff includes them as predicate conduct for a 1983 claim, which is not possible.  Further, it is not clear whether the claim has been abandoned.  Defendants do not present any argument as to those claims, and so Plaintiff does not present any counterargument.  The court will not address these claims herein because, even if they are still active, the only apparent basis for federal jurisdiction (and the only stated basis in the notice of removal) is federal question jurisdiction.  As this ruling grants summary judgment on all federal claims, the court declines to hear any state claims that might remain.

discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973), holding modified by *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).

### 1. *Discrimination*

"Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). Recognizing that "most discrimination and retaliation is not carried out so openly as to provide direct proof of it," *Sanders v. New York City Hum. Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004), plaintiffs asserting disparate treatment claims, as Mr. Youte does in this action, may show discriminatory intent either by direct or circumstantial evidence of animus, *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022).

Plaintiff does not adduce any direct evidence of discrimination, but he still may survive summary judgment by showing circumstantial evidence of discriminatory animus using the *McDonnell Douglas* burden-shifting framework. *Id.* at 130. First, he must make a prima facie case by showing that he is a member of a protected class, that he is qualified for the position of bus operator, that he suffered an adverse action, and that the facts imply a discriminatory intent. *Id.* If he does so successfully, the burden shifts to Defendants to proffer a legitimate, non-discriminatory reason for the adverse action. *Id.* Then the burden shifts back to Plaintiff to show that the proffered reason is pretextual. *Id.*

There is no dispute that Plaintiff has satisfied the first, second, and third elements of the prima facie case.  Defendants argue, however, that there is no evidence from which a reasonable juror could infer discriminatory animus.  And even if Plaintiff has stated his prima facie case, Defendants contend that they have proffered a legitimate, non-discriminatory reason for his termination, which reason Plaintiff cannot show was pretextual.

There are several recognized methods by which a Title VII plaintiff can show circumstances which might lead a reasonable juror to infer discriminatory animus.  One such method, and the method Plaintiff uses here, is by pointing to comparators who are similarly situated to the plaintiff, but who are not of the same protected class, and who were not treated as harshly as the plaintiff.  *Id.*  In using this method, a plaintiff must show that they are "similarly situated in all material respects" with their proffered comparators. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  A comparator need not be identical to a Title VII plaintiff, but generally they must be subject to the same work standards and they must have engaged in conduct of "comparable seriousness" to the plaintiff.  *Id.* at 40.  "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury."  *Radwan*, 55 F.4th at 132 (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).  However, in rare cases, "the issue can be resolved as a matter of law."  *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008).

Plaintiff has named three comparators who, he asserts, are similarly situated to him but who have been treated more favorably in their disciplinary proceedings.  These

three bus operators do not share Plaintiff's race and ethnicity, and all three have gotten into bus accidents on the job.  Not one of them, though, was terminated.

As bus operators, all three are subject to the same work standards as Plaintiff. Defendants assert, though, that none of the named comparators is similarly situated because none of them has so extensive a disciplinary record as Plaintiff has, and therefore they have not engaged in comparably serious conduct.

There is too little information in the record about two of these comparators to determine whether they are similarly situated to Plaintiff.  Aside from Plaintiff's assertion in his affidavit that they were involved in traffic accidents, the only evidence of their disciplinary histories is a competing affidavit from Defendant Holcomb asserting that neither individual's disciplinary record was as extensive as Plaintiff's.  Plaintiff does not refute this assertion, nor does he provide any other detail about either accident, or about either employee.  Thus, the record is silent as to who was at fault in these accidents, what discipline these individuals were issued by GBTA, and how many violations these individuals committed as bus operators aside from the accidents.  As such, it is impossible to determine whether these individuals engaged in comparably severe conduct as did Plaintiff.  Accordingly, the court finds as a matter of law that Plaintiff has failed to adduce sufficient facts about these two bus operators to show that either is a viable comparator.

There is similarly little description of the third proffered comparator ("Comparator Newman").  Plaintiff asserts that he was in a fatal accident, but there is little else in his responsive brief to aid the court's analysis.  However, since there is substantially more information in the record (including several disciplinary reports), and since the court must view the evidence in Plaintiff's favor, the court will review those reports in this discussion.

It appears from these reports that Comparator Newman was disciplined for some of the same infractions as Plaintiff. Comparator Newman also was disciplined for violating traffic law, ECF No. 36-3 at CM/ECF p. 197; for passing by passengers without picking them up, *id.* at CM/ECF p. 211; and for driving without a valid medical card, *id.* at CM/ECF p. 215. He also was the subject of a passenger complaint.

Many of these infractions appear qualitatively distinct, though. There is evidence of only a single passenger complaint against Comparator Newman, for example, and that dealt with an incident during which he moved his hand to prevent the complainant from swiping her pass prematurely, and he accidentally struck the rider's hand in so doing. *Id.* at CM/ECF p. 203. This conduct is not nearly so serious as the conduct that the several complaints against Plaintiff alleged (specifically, the repeated allegations of sexual harassment).

And while it is undisputed that Comparator Newman was involved in a fatal accident, there, too, Plaintiff has failed to describe details that show the severity of Comparator Newman's conduct. The only additional detail in the record is an affidavit by Defendant Holcomb in which he asserts that an elderly individual stepped out behind Comparator Newman's bus and GBTA determined that the accident was not preventable.[13] *Id.* at CM/ECF p. 13. Thus, it appears that this incident, though tragically serious, also does not match Plaintiff's infractions with respect to the operators' relative culpability.

---

[13] Plaintiff provides as an exhibit part of an online article that states that Comparator Newman was arrested in connection with this accident, but even this does not shed more light on what happened. In the first instance, news articles generally are not competent evidence for review at summary judgment. *See Tokio Marine & Fire Ins. Co. v. Rosner*, 206 F. App'x 90, 95 (2d Cir. 2006) (finding a news article to be "inadmissible hearsay" that "cannot defeat summary judgment."). Moreover, though, the article does not describe what happened in that prosecution, so the court can infer nothing from the alleged fact of Comparator Newman's arrest.

Furthermore, it is not clear that Comparator Newman's record was quantitatively comparable to Plaintiff, which is a material factor given Defendants' assertion that Plaintiff's termination was based on his disciplinary record as a whole. The record indicates that Comparator Newman received a total of two verbal warnings, four written warnings, one passenger complaint, and one one-day suspension over a six-year period.[14] In comparison, Plaintiff received three verbal warnings, six written warnings, five suspensions (four one-day suspensions and one six-day suspension),[15] one last-chance agreement following a termination, and six passenger complaints[16] over a nine-year period. While the number of written and verbal warnings between the two individuals are approximately on par, the number of more serious violations (the complaints and the suspensions and the terminations) clearly are not, even considering Comparator Newman's fatal accident. Nor is there any indication Comparator Newman committed more infractions than those for which he was disciplined, or even that he received any special treatment in the course of the investigation into his accident, so the court cannot infer discrimination from the relative severity of Plaintiff's performance record.

In sum, the court must conclude that Comparator Newman is not similarity situated to Plaintiff for purposes of showing the final element of the prima facie case.

But even if the court were to accept for the purpose of this discussion that Comparator Newman is similarly situated to Plaintiff in all material respects, it still cannot find that Comparator Newman was treated differently than Plaintiff. To the contrary, it

---

[14] Defendants assert that he had few disciplinary actions over a 30-year career, but there is no substantiating evidence of this assertion.

[15] Plaintiff's first termination also was converted to an unpaid suspension as a condition of the last-chance agreement, and he was suspended without pay pending the investigation that ultimately led to his termination, but the court does not include those here.

[16] The court includes the complaint that was filed after Plaintiff's first termination, but did not result in any additional disciplinary action.

appears that when Comparator Newman was charged with similar infractions to those Plaintiff was charged with committing, he received similar treatment and discipline. Moreover, it appears that GBTA's treatment of both Plaintiff and Comparator Newman followed the progressive discipline policy outlined in the GBTA work rules.

In 2013, for example, Comparator Newman neglected to inform dispatch that he needed to leave his bus unattended.  ECF No. 36-3 at CM/ECF p. 191.  He was issued a verbal warning because it was a first offense.  Similarly, in 2010, Plaintiff was issued a verbal warning for his first violation (a violation of the cell phone policy).  Plaintiff was issued a written warning for his second violation (making a false report), and a one-day suspension for this third violation (failing to report an incident).  Comparator Newman also received progressive discipline when he had two preventable accidents in one year, first receiving a verbal warning and then a written warning.  *Id.* at CM/ECF p. 206.  Comparator Newman received a written warning in 2014 for violating traffic laws a second time, *id.* at CM/ECF p. 197; Plaintiff received the same discipline for violating traffic laws in 2013.  In 2018, Comparator Newman passed by a passenger without picking him up.  Although Comparator Newman said that he did not see the passenger waiting to be picked up, he was issued a written warning.  *Id.* at CM/ECF p. 211.  In June 2014, Plaintiff also received a written warning for failing to board passengers.

When Comparator RN drove for one day without a valid medical card, he was given a one-day suspension.  *Id.* at CM/ECF p. 215.  When Plaintiff drove for six days without a valid medical card, he was given a six-day suspension.  Although Plaintiff asserts that this is a discrepancy, the court disagrees.  Both operators were given the same punishment: one day of suspension per day of violation.

Even in Defendants' response to Comparator Newman's fatal accident and the February 2019 passenger complaint against Plaintiff, it appears that both employees received the same treatment, as prescribed by the CBA and GBTA work rules. Each was placed on investigatory suspension[17] pending a full investigation into his incident, and his treatment thereafter followed GBTA work rules procedure. Again, there is no allegation that the investigation into Comparator Newman was lax or improper, and so the difference in disposition of those two investigations raises no inference of discrimination.

The court acknowledges that Comparator Newman arguably fared better than Plaintiff in defending against passenger complaints. In response to the one complaint lodged against Comparator Newman, he received a counseling session rather than discipline. *Id.* at CM/ECF p. 203. There, though, as discussed supra*,* the circumstances were very different from the complaints lodged against Plaintiff. And notably, this apparently was the only passenger complaint submitted against Comparator Newman.

Thus, it appears from a comparison of Plaintiff's and Comparator Newman's records that similar conduct garnered similar treatment, as dictated by GBTA's progressive discipline policy and the CBA. Plaintiff received the same discipline as Comparator Newman for similar violations, but he simply had many more violations and many more serious violations than Comparator Newman had. Accordingly, even assuming that Comparator Newman and Plaintiff are similarly situated, they clearly were not treated differently. Consequently, the Motion is granted as to the discrimination claim.

---

[17] Plaintiff attempts to use his investigatory suspension as proof that Defendants did not follow their own policy, but he has conflated disciplinary suspensions, which are punishment meted out after an investigation has been conducted and which carry certain procedural protections, and investigatory suspensions, which are periods of leave imposed while GBTA determines whether discipline should issue in the first instance, and which does not make any procedural demands of Defendants. *See* ECF No. 47 at CM/ECF p. 41. Therefore, this argument clearly is without merit.

*2.  Title VII Retaliation*

Retaliation claims follow a burden-shifting framework similar to that for discrimination claims. "First, the plaintiff must establish a prima facie case of retaliation by showing: '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'"  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005).  Again, success at this step shifts the burden to Defendant to articulate a legitimate, non-discriminatory reason for the adverse action.  *Id.*  And finally, the burden shifts back to the plaintiff to proffer evidence from which a factfinder reasonably could infer a retaliatory motive for the adverse action.  *Id.*

The only element of this prima facia test that Defendants concede is the third; they acknowledge that termination is an adverse employment action.  But they dispute that Plaintiff ever made a complaint of discrimination; that the relevant decision-makers knew of that complaint (if he indeed make it); or that there was any connection between the alleged complaint and Plaintiff's termination.

The court acknowledges that the sole evidentiary support for Plaintiff's assertion that he complained of discrimination is his own testimony, which has not remained entirely consistent throughout this litigation.  But it is not for the court to make credibility determinations, and it must be acknowledged that if there were to be any documentary evidence of such complaints, they would be in the Defendants' possession.  As the court cannot conclude that no reasonable juror could believe Plaintiff's testimony, the court will accept that the first element is satisfied.

17

It is of no moment that there is no record evidence that anyone other than Director Engram knew of Plaintiff's alleged complaint. It would not be unreasonable for a jury to infer that Director Engram communicated Plaintiff's complaint to other executives, and Plaintiff is not obligated to show that the specific decisionmaker knew of his complaint. *See Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 147–48 (2d Cir. 2010) ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.") (quoting *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000). So the court also will accept this element as satisfied.

But yet again, Plaintiff cannot satisfy the final element in his prima facie case. There is nothing in the record that indicates a causal connection between Plaintiff's alleged complaints and his termination. It is possible for temporal proximity alone to show causation, but it is not clear from the record when Plaintiff made his complaints. It appears the 2019 complaint refers to one of the CCHRO complaints, which Plaintiff lodged after he already had been terminated, so those clearly cannot satisfy the final element. And the court is not convinced that the approximate span of four months between Plaintiff's alleged complaint to Director Engram in 2018 and his termination is a sufficiently short period to satisfy the causation element of Plaintiff's prima facie case. *See Dixon v. Int'l Fed'n of Accts.*, 416 F. App'x 107, 110 (2d Cir. 2011) (finding the temporal proximity of four months insufficient to show causation); *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (noting that temporal proximity must be "very close" and citing approvingly a case in which a three-month delay between protected activity and an adverse action was found to be insufficient to show causation); *but see Grant v.*

*Bethlehem Steel Corp.,* 622 F.2d 43 (2d Cir. 1980) (finding adverse action after approximately eight months close enough in time to raise an inference of discrimination). Moreover, a longer view of the relevant timeline shows that Plaintiff was subject to discipline (and even fired) long before his alleged complaint to Director Engram and long before his final termination in 2019.  Viewing the totality of Plaintiff's circumstances, the court is not convinced that Plaintiff has stated his prima facie case.

(a) *Pretext*

Even assuming Plaintiff has stated a prima facie case, the court still would find that Defendants have shown a legitimate, non-discriminatory reason for Plaintiff's termination: his long history of serious and repeated violations of GBTA policies.  Although Plaintiff counters that this proffered reason is pretext, nothing in the record supports his argument.

In the first instance, Defendants have submitted substantial documentation spanning a decade to support their position, including passenger complaints, formal warnings, and even Plaintiff's last-chance agreement.  With only a few exceptions,[18] there is nothing in the record showing that Plaintiff denied any of the charges levied against him during his tenure at GBTA.  He apparently did not allege any discrimination until almost a decade after he began building his disciplinary history.  Thus, there is no evidence that his disciplinary history was fabricated or exaggerated.  Plaintiff's well-documented record of repeated violations of GBTA work rules is more than adequate reason for his eventual termination.

---

[18] Notably, Plaintiff apparently denied having committed the conduct underlying two of the sexual harassment complaints, ECF No. 78 ¶¶ 18, 20 and responses, and one of the complaints of passing by a passenger without stopping (the latter of which resulted in Defendant Holcomb removing a written warning from Plaintiff's record because he believed Plaintiff's defense that he did not see the passengers), ECF No. 36-3 at CM/ECF p. 170.

Plaintiff makes the untenable argument that Defendants were prohibited from considering his prior disciplinary history when making the decision to terminate him. He points to a clause in his last-chance agreement that states that the particular resolution would be kept confidential and would not have precedential value in future disciplinary action. ECF No. 36-5 at CM/ECF p. 165. Plaintiff contends this means that *none* of the *lengthy* record of violations before the last-chance agreement *ever* could be considered in *any* disciplinary proceedings following the expiration of the last-chance agreement.

Plaintiff's interpretation of that clause plainly is exceedingly overbroad. By his reading, any GBTA employee whose performance had fallen so short of satisfactory that they had been put on probation would have their entire record expunged. This reading, which would confer upon the worst performers the most lenience, defies logic, but more importantly, it defies the plain language of the agreement. The clause clearly indicates that the *resolution* (i.e., the fact of the last chance agreement) shall be kept confidential and will not be used against Plaintiff in the future. In other words, while the infractions that led to his being placed on probationary status would continue to be reviewable in future disciplinary proceedings, the fact that he already had completed a last-chance term would not be. Defendants and Plaintiff's union interpreted the clause thusly, and for good reason; otherwise, an employee's probationary period would be temporary in form only. An employee entering into a last chance agreement would require some assurance that the probationary period would not continue ad infinitum such that any minor infraction at any point in the distant future might lead to termination. The clause makes clear that usual work rules and the CBA would govern an employee's terms of employment after the probation term. The court has no trouble rejecting Plaintiff's argument on this point.

Even if the court were to adopt Plaintiff's reading of the last-chance agreement, the violations committed on February 13, 2019, alone would justify Plaintiff's termination.

The court finds that it was reasonable for Defendants to credit the complaint that Plaintiff solicited sex from a passenger, even if the court were to credit Plaintiff's denial of the same. Defendants conducted a fulsome investigation of the incident, to include following up with the passenger (whose story remained constant), and reviewing video of Plaintiff's interaction with her while on the bus, which was consistent with her account. Even if Defendants' conclusion was incorrect, it was reasonable. *See Graham.*, 230 F.3d at 44 (finding that an employer did not need to show that certain evidence it relied upon was accurate, but that the fact of its reliance was reasonable). While the court must credit Plaintiff's version of events in this ruling, Defendants need not have done the same in addressing the complaint against Plaintiff. And it is clear that under GBTA work rules, immoral conduct is a Category II violation, which may result in immediate termination. There is no evidence that Defendants' investigation into the incident was improper in any way, and so the complaint alone is a sufficient independent basis for Plaintiff's dismissal.

Moreover, that allegation did not form the sole basis for Plaintiff's dismissal. Rather, he was terminated for overall poor performance, and he committed several other infractions during his shift that day. He also was charged with rolling through a stop sign, running ahead of schedule, taking an unauthorized layover, failing to collect a fare, and violating the electronics policy.[19] Per GBTA policy, failing to collect a fare alone would be sufficient to justify Plaintiff's termination, but the other violations also provide ample cause for termination, particularly in light of Plaintiff's work history (which was rife with similar

---

[19] It actually appears that he violated the cell phone policy twice, but he was only charged with one such violation. ECF No. 36-6 at CM/ECF p. 142 ("There was more than one offense here with cell phones.").

violations) and his warning (upon expiration of his last chance probationary period) that any future violations would result in his termination.

Plaintiff quibbles with Defendants' characterization of several of these infractions. He insists that he was permitted to take the missed fare from the non-paying passenger the next time he saw her, but this misstates the policy laid out in the GBTA work rules; it provides that a bus operator must attempt to collect a fare from all passengers, but that where a passenger has insufficient or inexact funds, the operator may elect, in their discretion, to allow the passenger to pay the difference on their next ride.  ECF No. 36-5 at CM/ECF p. 143.  Clearly, that is not what happened here, as Plaintiff knew that the passenger had sufficient funds in the form of an unlimited bus pass, and he did not make any attempt to collect fare from her.

Plaintiff next asserts that he was not running sufficiently behind schedule to justify informing the dispatcher, but he was not charged with running behind schedule (though it appears that, at times, he was indeed behind); he was charged with running *ahead* of schedule.  Therefore, this argument is inapposite.

Plaintiff also states that he often took a break at the end of this route to use the restroom at a gas station, but even taking that as true, there is no indication that Defendants knew of that practice such that their failure to discipline him for it could create an inference of animus.  The court notes that Plaintiff himself estimates he only made this stop 20–25 times in the course of his 10 years at GBTA.  ECF No. 45 at CM/ECF p. 24. It is not reasonable to infer that GBTA knew of a practice he only employed twice per year.

Moreover, while Plaintiff cites to the GBTA work rules to show that he followed protocol for a layover, he misses Defendants' point that the layover was unauthorized. He appears to argue that because the work rules allowed a bus operator to try to make up time if they were running behind, and only required bus operators to notify dispatch if they were running at least ten minutes behind schedule, he was permitted to take a layover at any time provided he did not run behind more than ten minutes. Not only does this reading defy the GBTA's explicit instruction in the work rules that buses are to leave the starting and ending points of a route on time, ECF No. 36-5 at CM/ECF p. 119, but the line immediately following the provision that Plaintiff highlights clearly states that unscheduled stopovers are prohibited, *id.* Plaintiff never has asserted that there is a layover built into the schedule at the end of the route in question, and therefore the court finds that fact undisputed. Consequently, Plaintiff's failure to adhere to the schedule indisputably is a violation of work rules. Moreover, it is a repeated violation, since Plaintiff was written up for taking an unauthorized layover in April 2017, after his probationary period. *Id.* at CM/ECF p. 167. That warning clearly said that further violations would incur progressive discipline, and the work rules clearly state that willful or repeated violations shall be grounds for termination. *Id.* at CM/ECF p. 148.

Plaintiff also denies rolling through a stop sign or using his cell phone while the bus was in operation, but Plaintiff's union president confirmed during a deposition that all of Plaintiff's alleged misconduct was captured on the bus's video footage, and furthermore that all of those actions are violations. ECF No. 36-6 at CM/ECF p. 140 ("I remembered seeing him. It was a roll through the stop sign."); *id.* at CM/ECF p. 100 (responding in the affirmative when asked if Defendant O'Keefe had shown him footage of Plaintiff utilizing

an electronic device); *id.* at CM/ECF p. 101 ("I think someone sent [Plaintiff] a message or something.  He looked down on [his phone]. . . But he's in operation.  And that is a violation."); *id.* at CM/ECF p. 107 ("[W]hen [Defendant O'Keefe] told me what time he was supposed to be [at the end of the line] and what time he arrive and what time he left, it's an unauthorized layover.").  In fact, it appears the union did not even attempt to argue that the violations never occurred, but only that the punishment should be downgraded.  The court notes this testimony not to assess credibility of competing factual allegations, but to point out that there is nothing in the record indicating that Plaintiff ever asserted his innocence as to these other violations prior to this litigation.  The fact that Defendants relied upon apparent admissions at the time of Plaintiff's termination hearing also supports the court's conclusion that the proffered reason for Plaintiff's termination is not pretextual.

And even if Plaintiff had professed his innocence to Defendants, the infractions he has conceded[20] are more than adequate grounds for dismissal, separately or together, particularly considering that he previously received discipline for such acts, and termination was contemplated by the progressive discipline plan in the GBTA work rules.

In summary, although Plaintiff attempts to chip away at the myriad allegations against him, he fails to show that any of those infractions improperly were charged.  Further, he fails to show the impropriety of Defendants' consideration of his work history.  He also fails to adduce any additional evidence indicating that discriminatory animus played any role in Defendants' final termination decision.  Accordingly, even assuming he could make his prima facie case for retaliation, he fails to carry his burden of showing that

---

[20] By this, the court refers to those infractions which Plaintiff unpersuasively argues are not infractions: failing to collect fare, running ahead of schedule, and the unauthorized layover.

Defendants' proffered, non-discriminatory reason for his termination was pretextual.  As such, Defendants are entitled to judgment as to any Count One retaliation claim.

### B. Count Two: Fourteenth Amendment

Plaintiff also has brought claims under 18 U.S.C. § 1983.  There are two elements of such a claim: "(1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015) (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir.2004)).   It is undisputed that the second element is satisfied here; Defendants are state actors. Plaintiff asserts that the first element is satisfied, too, because Defendants have violated his rights under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment.

The Equal Protection Clause protects public employees from discrimination at the workplace.  *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir.2006).   Employment discrimination claims under the Equal Protection Clause can arise from class-based discrimination, but they need not.  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials.").   Class-based equal protection claims, in the employment context, are analyzed in the same way that Title VII claims are analyzed, using the *McDonnell-Douglas* burden-shifting framework.  *Abdul-Hakeem v.*

*Parkinson*, 523 F. App'x 19, 20 (2d Cir. 2013) ("In the context of a § 1983 suit where the 'color of state law is established, [an] equal protection claim parallels [a] Title VII [employment discrimination] claim.'") (quoting *Feingold*, 366 F.3d at 159) (alterations in original); *see also Vega*, 801 F.3d at 88 ("[F]or a § 1983 discrimination claim to survive a motion for judgment on the pleadings or a motion to dismiss, a plaintiff must plausibly allege a claim under the same standards applicable to a Title VII claim—and that the adverse action was taken by someone acting 'under color of state law.'").  However, as discussed supra, Plaintiff failed to make his prima facie case under that framework, and so this avenue to an equal protection claim clearly is foreclosed.

Plaintiff asserts, though, that he can carry his equal protection claim by either of two methods: (1) by showing selective enforcement (i.e., that he was treated differently than similarly situated individuals, and that such treatment was based on an improper motive, such as malice, or a bad-faith intent to injure); or (2) under a "class-of-one" theory, by showing that he was treated differently than other similarly situated individuals and that there is no rational basis for such treatment.  *See Sherine Eldars* v. *State Univ. of New York at Albany, et al*, No. 20-2693, 2021 WL 4699221, at *3 (2d Cir. Oct. 8, 2021).

However, the Supreme Court clearly has held that the "class-of-one" theory of recovery is inapplicable in the employment context.  *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 594, (2008).  So this path also is closed.  The Second Circuit also has declined to address whether *Engquist* bars malice-based equal protection claims in the employment context, so it is unclear whether Plaintiff can oppose summary judgment on either of these theories in the first instance.  *Hu v. City of New York*, 927 F.3d 81, 100 n.5 (2d Cir. 2019).

Even assuming Plaintiff can proceed on a malice-based legal theory, he clearly fails to satisfy the elements of such a claim.  Any version of the selective enforcement theory requires a plaintiff to identify a similarly situated individual who has been treated differently than him.  The court already has determined that Plaintiff failed to do that in relation to his Title VII claim.  *Hu*, 927 F.3d at 96 (holding that the similarity standard for an equal protection claim is the same as the standard articulated in  *Graham*, 230 F.3d 34, for Title VII cases).  Moreover, there is no record evidence from which a jury reasonably could infer that Defendants' treatment of Plaintiff was motivated by malice or bad faith.  To the contrary, Plaintiff's termination for overall poor performance amply was supported by his long and consistently unsatisfactory disciplinary history.

Thus, it is clear that Plaintiff also cannot state an equal protection claim on a selective enforcement theory; consequently, Defendants are entitled to summary judgment on any equal protection claim asserted in Count Two.

With respect to the due process claim, it is undisputed that Plaintiff only could be terminated from the GBTA for cause, thus he had a property interest in his continued employment.  *Gilbert v. Homar*, 520 U.S. 924, 928–29 ("[P]ublic employees who can be discharged only for cause have a constitutionally protected property interest in their tenure . . . .").  Accordingly, before being terminated, "he was entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  Plaintiff asserts that he was not afforded this process.

It is abundantly clear from the record that Plaintiff got all the process he was due under the Constitution and then some.  Even ignoring the process he received indirectly

through the union president, it is undisputed that at his termination hearing he was given written notice of the charges against him and a memorandum summarizing the evidence reviewed in Defendant O'Keefe's investigation, and also that he was given an opportunity to speak on his own behalf.  At a minimum, this satisfies all constitutional requirements. He also was given additional process through the union president, who knew the charges in advance (either through written notice or Defendant O'Keefe's verbal statement), saw the relevant video in advance, and accompanied Plaintiff to the termination hearing. Moreover, Plaintiff took advantage of substantial post-termination processes afforded him under the collective bargaining agreement.  *DiCesare v. Town of Stonington*, 823 F. App'x 19, 23 (2d Cir. 2020) ("We have been clear that '[w]hen ... a public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards.'") (quoting *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001)).

Accordingly, Defendants are entitled to summary judgment on any due process claims in Count Two, as well.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment, ECF No. 36, is **GRANTED.**  To the extent any state law claims remain, the court declines to exercise jurisdiction over them.

2. The Clerk of Court is asked, respectfully, to please enter judgment in Defendants' favor and to close this case**.**

**IT IS SO ORDERED** at Hartford, Connecticut, this 29th day of March, 2024.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE